Anthony Marcella and Bessie Marcella v. Commissioner.
Marcella v. Commissioner
Docket No. 38043.
United States Tax Court
1954 Tax Ct. Memo LEXIS 316; 13 T.C.M. (CCH) 82; T.C.M. (RIA) 54036; January 29, 1954
*316 Joseph A. Hoskins, Esq., and R. E. McGannon, Esq., for the petitioners. R. H. Garrison, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves a deficiency in income tax for the year 1947 in the amount of $10,635.73 and a fraud penalty in the amount of $5,317.87. The issues are (1) whether petitioners understated their joint income; (2) the long-term capital gain realized from the sale of a piece of real property; and (3) whether any part of the deficiency is due to fraud with intent to evade tax. Findings of Fact The petitioners are husband and wife residing in Kansas City, Missouri. They filed a joint return in June 1948 for the taxable year with the collector of internal revenue for the sixth district of Missouri. The return reported no income of the wife. Anthony Marcella, the husband, will be referred to hereinafter for convenience as the petitioner. Petitioner reported in the return that his occupation was a "Tavern Operator." Petitioner was convicted on one occasion under the alias "Tony Amore," which he started to use about 1930. During 1947 he used the alias "Tony Ventola." In 1952 petitioner *317 completed a term of imprisonment in a Federal prison which had been imposed upon him for selling liquor without payment of a special stamp tax. During 1947 and for several years prior thereto, petitioner operated three taverns in Kansas City, Missouri, in which he sold liquor at retail by the drink, bottle, and case. The taverns were known as Congress Cut Rate Liquor Stores Nos. 1, 2 and 3. He also owned and operated as a business a farm located at 13203 Wornall Road, at which he sold liquor by the case. Sales made at the taverns and the farm were for cash. Spot delivery was made of liquor sold at the farm. Separate cash registers were used to record sales at the bar and by the bottle in the taverns. The cash register tapes, together with receipts and memoranda of money paid out, were deposited daily in folders by the bartenders at each tavern. No memoranda or sales tickets were made for sales made by the case. The books maintained by petitioner for the taverns were kept on an accrual basis by a part-time bookkeeper, whose regular duties required him to remain out of Kansas City at times for five or six weeks, during which time he made no entries in the books. Petitioner made *318 daily collections of the cash receipts of the taverns, which he either deposited in a bank or retained on his person. No separate record was made of the cash so collected by petitioner. The folders kept by the bartenders were picked up by the bookkeeper and used by him for making entries in the books. Some of the cash not deposited by petitioner was used to purchase liquor. The bookkeeper kept a separate account for each tavern for bar, bottle and case sales. Petitioner kept no records to show how much of each purchase of whiskey was placed on sale by the bottle or by the case. Entries made in the books for goods so sold were based upon information the petitioner gave his bookkeeper orally. Petitioner advised the bookkeeper orally from time to time of the selling price in excess of invoice cost of each brand of liquor sold at the taverns in case lots and entries were made in the books pursuant thereto. At times the bookkeeper did not have an invoice for the purchase of the lot sold by the case. The books maintained by petitioner included a journal in which entries were made for purchases, sales and expenses of each tavern. No cash account was kept for receipts or disbursements. *319 In lieu thereof entries were made in the account of petitioner by charges for sales and credits for purchases. The books contained no account for payables. At the close of each year petitioner informed his bookkeeper of the amounts owing for purchases. The information was accepted without vertification of its accuracy. The amounts so supplied were then charged to purchases with a balancing credit to the account of petitioner, and reversed on January 1 of the next year to clear the books of the entries. The amounts entered at the close of 1946 and 1947 totaled $2,499.33 and $15,005.12, respectively. The entries made in the books for sales made in 1947 by the case were as follows: Store
No. 1
No. 2
No. 3
Jan.
$ 7,094.99
$ 1,839.22
$1,872.84
Feb.
12,982.69
267.88
267.88
Mar.
22,851.47
2,043.62
267.88
Apr.
14,009.25
May
18,642.90
June
38,629.89
July
14,809.00
Aug.
10,485.92
Sept.
11,535.26
Oct.
39,775.56
Nov.
35,852.40
Dec.
49,912.39
27,046.29
4,357.13
Total
$92,941.54
$214,937.19
$6,765.73
The books of petitioner contain entries that the taverns had an opening inventory in 1947 of $97,182.42 and a *320 closing inventory of $90,433.26. The sheets on which the goods on hand at the beginning and close of 1947 were listed showed the quantity of each brand of liquor, to which the price was subsequently added. In addition to the records kept by his bookkeeper for the taverns, petitioner made notations in a separate book of amounts owed and payments thereon. The book contained 190 numbered pages, the first 96 of which, and pages 103 to 108, inclusive, are missing for reasons petitioner could not explain. The entries in the book were made by two employees of petitioner, not including the bookkeeper. About November 1949 petitioner made available to agents of respondent at their request certain books and records kept for the taverns, all of which were returned to his present accountant during the summer of 1950 after the agents completed their investigation of petitioner's return for 1947. Some of his records, including trial balances, and the separate book he kept for accounts payable, were not delivered to the agents. Petitioner returned net income of about $20,000 in 1943, $31,000 in 1944, and $39,000 in 1945. For 1946 he reported gross income of $352,000 and net profit of $37,888.24. *321 The books of petitioner disclose, and his return for 1947 reported, gross sales of $507,370.30 in 1947 at the three taverns, of which $90,325.29 was shown as bar sales, $102,500.55 as package sales, and $314,544.46 as sales by the case. The return reported a loss of $1,968.77 from the operation of the taverns. The books of account of petitioner for 1947 are incomplete, lack means of verification, and do not reflect his income, because of which respondent determined the income of petitioners by the "excess cash expenditures" method. He determined that petitioners had the following sources of cash and made expenditures of cash, as follows: Sources of Cash
Bank accounts
$10,956.71
Sale of one of taverns
4,500.00 a
Increase mortgage on home
2,500.00
Sale of house at 405 Gladstone
17,500.00
Total
$35,456.71 b
Personal Expenditures
Federal income tax including in-
terest of $291.17
$12,682.39 b
Personal expenses by checks
11,670.36 b
Furniture
4,051.84 c
Payment on farm at 13203 Wornall
Road, including expenses of
$5,826.71
9,826.71
Paid on home, 804 W. 64th Terrace
15,000.00
Mortgage payments, 804 W. 64th
Terrace
6,093.32
Checks out of proceeds of sale of
405 Gladstone endorsed to: Hamm-Singer Co.
2,000.00 d
McKesson-Robbins
500.00 d
Medical expense
455.15
Total
$62,279.77 e
*322 The difference of $26,823.06 between the expenditures and sources of cash was regarded by the respondent as unreported taxable income in determining the deficiency. The books of 11 wholesalers from which petitioner purchased liquor for sale disclose that his debts to them for the goods increased from $24,729.16 on January 1, 1947, to $45,471.83 at the close of the year. The records of banks disclose that between the beginning and close of 1947 petitioner's indebtedness to them on notes increased in the amount of $17,490.71. In 1947 petitioner paid $3,027.91 for interest on the loans. One *323 of the notes, executed in 1947 and on which there was a balance of $5,000 at the close of the year, was signed by petitioner and Joe Di Giovanni. In addition thereto petitioner owed another bank a balance of $6,300 throughout the year on a loan made in 1946 in the amount of $31,500. The notes were not entered in petitioner's books. The return filed by petitioner for 1947 contains a deduction of $520.27 for interest on business indebtedness. During 1946 and 1947 petitioner was engaged in a partnership venture with Frank Benanti and Pete Grego to deal in warehouse receipts for whiskey. The dealings in 1946 involved 50 barrels of whiskey, from the sale of which they reported a profit of $4,688.76, computed by deducting from gross receipts of $28,132.56, the amount of $23,443.80 for cost of "Merchandise bought for sale." In 1947 the partnership acquired warehouse receipts for 100 barrels of whiskey, of which 10 barrels were bottled and the remainder was sold to the original owner for less than the price paid for it. The partnership kept no books of account. It filed a partnership return for 1947 showing a loss of $8,496.58, computed as follows: Gross receipts
$19,488.00
Cost of merchandise
$23,526.00
Cost of labor, supplies,
etc.
4,458.58
28,984.58
Loss
$ 8,496.58
*324 The return was prepared by petitioner's bookkeeper from oral information given to him by Benanti and Grego. The petitioner claimed the amount of $2,832.20 in his return for 1947 as a loss sustained as a member of the venture. The amount was disallowed by the respondent in his computation of the deficiency. The amount of $5,826.71, paid in connection with the operation of the farm, was entered in the books as part of the transactions of store No. 2 and was capitalized at the close of the year. The books reflect no income received, if any, from the operation of the farm as a business and the business was not disclosed in the return for 1947. On April 5, 1947, petitioner sold for $17,500 a residence located at 405 Gladstone, Kansas City, Missouri, which he had purchased in 1942 at a cost of $5,000. The sale was not reported in the return filed by the petitioner for 1947. Respondent determined that petitioner realized long-term capital gain of $4,369.58 from the sale, one-half of which he included in taxable income. In his computation of the gain respondent allowed $8,130.42 for capital improvements to the property. In addition thereto, petitioner made capital expenditures totaling *325 $1,954.75 for electrical fixtures, rose bushes, shrubbery, trees, night latches and locks, storm windows, weather strips and plumbing, all of which he is entitled to recover as cost of the property sold. Some part of the deficiency for 1947 was due to fraud with intent to evade tax. Opinion Petitioners assert that respondent had no reasonable basis for disregarding their books of account from which the return was prepared and, accordingly, the use of the socalled "excess cash expenditures" method as an alternative was arbitrary and, therefore, invalid. Coupled with the statutory duty to file a return each year showing items of gross income is the requirement that adequate records be maintained to show the amount of such income. Petitioners were aware of their duty in that regard and kept some records. If the books maintained do not serve the purpose for which they are designed, the respondent has the administrative power to look elsewhere to ascertain the income subject to tax, and in doing so use the "excess cash expenditures" method. ; affd., ; ; affd., . *326 No records were maintained for the operations of the partnership and no original records of any kind were maintained for sales by the case. The entries made by the bookkeeper for case sales were based entirely upon oral information given to him by petitioner at times several or more weeks after the transactions occurred and the bookkeeper never questioned the accuracy of the figures. It does not appear that petitioner kept any reliable records as a basis for such oral information. No book account was kept for sales made at the farm. Although petitioner testified that sales at the farm were recorded under the accounts kept for one of the three taverns, his bookkeeper testified that during 1947 petitioner's individual business consisted of selling liquor at the taverns. None of the bookkeeper's testimony discloses that he was aware of sales made by the case at the farm. All of the evidence on the point shows that respondent was justified in resorting to means others than the books to determine petitioner's income tax liability. Petitioners recognize that approval of respondent's alternative method of computing taxable income requires proof by them of error in the items composing *327 the computation. Respondent concedes that the list of expenditures contains a duplication in the amount of $174.86, and that no allowance was made therein for a total of $1,136.21 as deductions for interest and contributions to charity. The list of personal expenditures prepared by respondent includes $2,000 paid to Hamm-Singer Company, and $500 to McKesson-Robbins out of the proceeds of sale of the 405 Gladstone property. They were treated as personal expenditures because of inability to verify the payments in the account kept for purchases of whiskey. The investigating agents did not contact the recipients of the money in an effort to ascertain the reason for the payments. The effect of respondent's position as to these two items is to rely on books which he contends, and properly so, were inadequate for tax computing purposes. The basis for the method adopted by the respondent here to arrive at petitioner's taxable income is nonbusiness sources of income and personal expenditures. The procedure requires more inquiry into the nature of expenditures than is disclosed here as to the $2,000 and $500 items. The proof of petitioner is that the amounts were paid for liquor, income *328 from the sale of which in a business being the primary issue in the proceeding. It thus appears that the payments were not personal expenditures and respondent erred in so including them in his computation. The petitioner conceded at the hearing that he had at least $35,456.71 of cash available for personal expenditures, as determined by the respondent. On brief he contends that he is entitled to further allowances of cash available for expenditures in the amount of $27,497.83 for reduction in alleged paid inventory; $17,490.71 for an increase of notes payable at banks and $761.66 for the depreciation taken in his return. The result of the contention, with adjustments of $3,811.07 for expenditures, is a conversion of undisclosed income of $26,823.06, as determined by respondent, into a deficit figure of $22,738.21, or $17,937.24 in excess of the loss reported in the return. The books kept for the taverns were on an accrual basis. Petitioner reached the figure of $27,497.83 by adding to the difference of $6,749.16 between the amount of the opening and closing inventories reported in his return for 1947, the amount of $20,748.67 for an alleged increase during the year of unpaid liquor. *329 The purpose of the adjustments was to convert the inventory to a cash basis, or paid inventory. Petitioner asserts that reduction of paid inventory made $27,497.83 available for expenditures. Assuming that the circumstances produced the declared result, no allowance could be made because of lack of proof of the bases for the computation. Petitioner sought to prove his indebtedness for liquor in the inventories through testimony based upon the books of the sellers. The testimony was received subject to substantiation. There was no corroboration. The books maintained by the bookkeeper disclose an increase in accounts payable of only $12,505.79. But that figure is not sufficiently reliable for acceptance as proof. It is based upon oral information given to him at the end of the year by petitioner and may include purchases of goods other than for the inventory. The entries were made at the end of the year merely as a basis for a credit to the account of petitioner for purchases. Petitioner purchased liquor from wholesalers other than the creditors to whom he claims amounts were owed for goods in the opening and closing inventories, but no evidence was offered on the amounts owing to *330 them. Adjustments in petitioner's computation for any of such debts might very well be sufficient to change the result to a zero or minus figure. In an effort to substantiate the figures petitioner produced a book allegedly kept for him by an employee, other than the bookkeeper, to show his accounts payable. The existence of the book was not divulged to the investigating agents when they demanded that petitioner produce all of his records for use in examining the correctness of the return for the taxable year. The book purports to cover no more than 1947. No similar book was kept for prior years, because, according to testimony of petitioner, the so-called 30-day credit law applicable to sales of liquor by wholesalers was not passed until 1947. The statute referred to by petitioner was enacted and effective in 1943. Missing pages in the book are not accounted for and no contention is made that it contains entries for all of the accounts payable relied upon by petitioner in his computation. The evidence offered to prove an increase during 1947 of $17,490.71 in loans from banks is confined to books of the creditors. The notes given to evidence the loans were not entered in the books *331 of petitioner. To obtain any benefit from an increase in borrowed funds there must be evidence establishing that the funds were used to pay personal expenses. Such proof was not made. Concerning the item of depreciation, there is no proof that the depreciation was sustained. Moreover, depreciation on property would not make an equivalent amount of cash available to pay expenses. The partnership kept no books. The loss of $2,832.20 claimed by the petitioner in his return was based upon oral information given to the bookkeeper by petitioner's partners. Petitioner testified that 100 barrels of liquor were acquired at $10 a gallon; that 10 barrels were bottled and sold at a loss and that the remainder was sold to the original owner for less than cost. Without more, we are not warranted in holding that respondent erred in disallowing the deduction. Accordingly, his action will not be disturbed. The only question involved in the issue relating to gain or loss on the sale of the property at 405 Gladstone is whether petitioner is entitled to additional cost for capital improvements. The respondent allowed $8,130.42 for such costs. Petitioner is claiming an additional amount of $6,580.87, *332 an amount sufficient, with the original cost of $5,000, to create a loss of $2,211.29. We have found from the evidence that of the additional amount claimed by petitioner, $1,954.75 was expended for capital improvements. We regard the remaining items as upkeep expenses. Accordingly, the gain on the sale will be recomputed under Rule 50 by allowing additional cost of $1,954.75. Did respondent sustain his burden of proof that some part of the deficiency was due to fraud with intent to evade the tax by clear and convincing evidence? Petitioner asserts that there is no deficiency and that respondent offered no evidence to support his imposition of the penalty. The argument of respondent on brief is regarded by petitioner as based on no more than speculations and presumptions. "To establish fraud by direct proof of intention is seldom possible. Usually it must be gleaned from the several transactions in question and the conduct of the taxpayer relative thereto. * * * [." Petitioner in 1947 sold one of his taverns for $4,500 and the property at 405 Gladstone, on which profit was realized. The transactions were not only not disclosed *333 in the return, but the evidence contains no explanation for the failure to report the sales, in view of which the lack of any notice to respondent can not be charged to oversight. Absence of any disclosure of the facts concerning the sale of property clearly resulting in taxable gain is an indication of fraudulent intent to evade tax. Petitioner operated the farm at 13203 Wornall Road as a business. All of the expenditures for the business, amounting to $5,826.71, were capitalized in a "Farm" account in the books kept for one of the taverns. No entries were made for any income derived from the operations of the farm and the existence of the venture was not disclosed in the return. In addition to the three taverns, petitioner sold liquor by the case at his farm. No account, as such, was kept in the books for the operations, and the return declared petitioner's business to be that of an operator of taverns, with no reference to the liquor business conducted at the farm. All of petitioner's sales were made for cash. Sales by the drink and bottle at the taverns were recorded on cash register tapes, from which entries were made in the books. Petitioner collected the cash each day *334 but no cash account, as such, was kept in the books. The amount of cash receipts disclosed by the registers was charged to petitioner, because he took possession of all of it, and credited to sales. Similar treatment was not accorded sales by the case, which, according to the books, constituted $314,544.46 of gross sales of $507,370.30, or about 62 per cent of total sales. Sales by the case for cash at all of the places of business, including the undisclosed operations at the farm, were not recorded in any form as made. The basis for the entries made by the bookkeeper for such sales was oral advice petitioner gave him at infrequent intervals of the gross profit per case of specified lots of liquor. The information so supplied the bookkeeper was then recorded in the books by credits to sales at the taverns and charges to petitioner. The amounts of the invoices furnished to the bookkeeper were charged to liquor for sale by the case and credited to the account of petitioner, even though it might not have been paid. Petitioner testified on direct examination that his business was transacted at the three taverns. On cross examination he testified that sales by the case were made at *335 "some of the stores" and then, in response to a direct question, that some of the sales were made at the farm. The licenses held by petitioner for sale of liquor limited sales to the taverns. That the bookkeeper was not aware of the illegal sales at the farm is apparent. His entries for case sales were based entirely upon information given to him orally by petitioner and he never questioned the data so supplied to him for accounting purposes. Since no entries were made for liquor sales at the farm, a reasonable assumption is that such transactions were never entered in the books. In any event, the lack of any record of sales of whiskey in the books of the farm sales represents concealment of substantial income-producing activities, which tend to support our conclusion that a part of the present deficiency was due to fraud with intent to evade the tax. Petitioner testified that records were not made for case sales because they were made on a cash and carry basis. So were the sales made by the drink and bottle at the taverns, yet they were rung up on cash registers. A reasonable inference to be drawn from the evidence and lack of proof that petitioner personally made all of the case *336 sales is that the employees of petitioner were instructed to refrain from recording such transactions. The plan, viewed in its setting, discloses a purpose to conceal income. Considering all of the evidence we conclude that the return of petitioners was false and fraudulent with intent to evade tax. Decision will be entered under Rule 50. Footnotes
a. The sale was not reported by the petitioner in his return for 1947. ↩
b. The parties entered into oral stipulations at the hearing that these figures are correct except for the right reserved by petitioner to establish additional sources of cash. ↩
c. Respondent concedes that the figure should be $3,876.98 on account of a duplication of $174.86. ↩
d. These amounts were used by petitioner in the purchase of liquor for sale in his taverns. ↩
e. The parties stipulated that disbursements of this amount were made without agreeing that all of the items were of a personal nature.↩