**Emmitt R. WARRING, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 6930.**

United States Court of Appeals
Fourth Circuit.

Argued April 22, 1955.

·Decided May 23, 1955.

See also, D.C., 16 F.R.D. 524.

and fraudulent return stating his net income was $29,559.96, and the amount of tax was $12,005.31, whereas he knew his net income was actually $147,967.12 upon which he owed a tax of 104,087.45. A jury returned a verdict of guilty and the Court imposed a sentence of three years' imprisonment and a fine of $10,000 and costs; Warring has duly appealed to us.

Since the books exhibited by Warring to representatives of the Treasury Department were deemed worthless for the determination of taxable income, the Government utilized the cash disbursements method and the net worth method of ascertaining the taxpayer's true taxable income for 1947. Under both the cash disbursements method and the net worth method of proof, Warring's true income was shown to have been $163,000 for the year 1947.

Warring did not take the witness stand. The testimony of defense witnesses was largely limited to showing that Warring had on deposit at the Arlington Trust Company, Arlington, Virginia, as of July, 1946, $284.40; as of January, 1947, $285.82; and as of July, 1947, $287.25; that a building association made a loan on January 16, 1939, to Warring in the amount of $10,500; and that Warring had a balance in a building association account at the end of 1946 of $1.23 and at the end of 1947, $1.25. Also, that a member of the bar then representing Warring saw in 1939 "a great deal of money" in a safe of Warring's sister at her home on Massachusetts Avenue in Washington. The amount of this money was not established. The effect of the defense testimony, so the Government contends, was to increase, rather than decrease, Warring's unreported income for the year 1947.

The painstaking and able charge to the jury made by Judge Chesnut was deemed so fair to Warring by his counsel that they assert no error upon this appeal with respect to the charge.

Warring was a professional gambler engaged in the so-called "numbers" business, in which the betting, usually in small amounts, and the pay-off, are on a

G. C. A. Anderson, Baltimore, Md. (Charles E. Ford, Washington, D. C., and Anderson, Barnes & Coe, Baltimore, Md., on brief), for appellant.

George Cochran Doub, U. S. Atty., Baltimore, Md. (James H. Langrall, Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Emmitt R. Warring, an unmarried resident of Washington, D. C., was indicted in the United States District Court for the District of Maryland for federal income tax evasion in violation of Title 26 U.S.C.A. § 145(b). The indictment charged that Warring unlawfully attempted to defeat and evade income taxes for the year 1947 by filing with the Maryland Collector of Internal Revenue a false

cash basis. The business requires considerable organization, including a "writer," a "runner," a "controller" and a "backer." Warring was a "backer," who receives the money bet and makes the pay-off, through intermediaries, to the winners.

The chief attack by Warring's counsel seems to be that the net worth statement and the expenditures statement, introduced by the Government, were inadmissible in evidence on the grounds that these statements were inaccurate, replete with errors, uncorroborated and unsupported by any substantial evidence, and that the Government failed to follow obvious leads, furnished by Warring, which would have clearly shown how faulty were these statements. We think there is no merit in these contentions.

Warring's income tax return for 1947 described his income as a single item, bearing the somewhat cryptic designation "money won gambling." No income was reported as dividends from securities, interest from bonds, mortgages or loans, or rents. The return failed to disclose that Warring had a business or occupation, nor did it include any business deductions, such as expenses or losses. The return was prepared by Burdine, a Deputy Collector of Internal Revenue for the District of Maryland. Warring showed no books to Burdine, who merely took the figures furnished to him by Warring, included them in the return and figured the amount of the tax accordingly.

Although taxpayers are required to keep records sufficiently adequate to show true income in order that the Treasury Department might be able to verify tax returns, the books of Warring consisted of "little black books," which were deemed practically worthless for the purpose of verifying his return. The pencil figures in these notebooks were limited to a date, a number and one figure purporting to represent Warring's net income or net loss on that day. The notebooks did not disclose the gross receipts of Warring on any day, or the amount of any losses paid out, or from what the

receipts were derived, or to whom the alleged loss payments were made. The "little black books" were admitted in evidence over the Government's objection on the ground that there was no authenticating defense testimony explaining how these books were kept, who kept them, or that they showed or even purported to show Warring's true income for the year 1947. We examined these books on the bench.

The testimony of both Revenue Agent Ford and Special Agent Kennedy that these books were worthless for the purpose of ascertaining Warring's correct income was not controverted. Agent Ford testified that a backer, such as Warring, normally would have a slip from a so-called K book. This slip would show a nickname or symbol identifying the person betting with him, the amount bet and the number bet. From such slips, it seems evident, the Government could have verified any number which Warring claimed had hit and on which the bettor had been paid. No K books were introduced in evidence. There was no defense testimony that any K book slips, which Warring presumably kept, had been destroyed or were otherwise unavailable. The meagre figures in the little black book for the year 1947 purported to confirm the income reported in Warring's tax return.

Warring did not utilize normal business methods of handling his affairs. His business receipts were received in cash. He did not use a checking account at any bank until September 10, 1947, when he made a deposit of $12,000 in cash and checked out $11,750 on September 12, 1947, to pay for the so-called Belfiori property. On September 26, 1947, he deposited the sum of $25,000 in this account, but on the same day withdrew the sum of $24,500 to pay for the so-called Williams property. With the exception of these two deposits and two withdrawals in September, 1947, Warring never used a checking account in the year 1947 or in any prior year. He paid his Federal income taxes in cash. He purchased a Cadillac car in 1947 for

the sum of $3,500 for which he must have paid cash. He bought real estate and paid for that in cash, i. e., the Shapero property (3933–35 Massachusetts Avenue, N. W.) in 1937, cash $15,119.35; cash deposit on Williams property in 1947, $2,500; cash purchase of David property in 1947, $15,090.39; and cash deposit of $500 in 1947 on purchase of the Belfiori property. Since he had no checking account, his living expenses must have been paid in cash.

Warring's method of handling the receipts from his business was for him to go to the Pennsylvania Avenue Branch of the Hamilton National Bank two or three times a week with a canvas bag containing coins and currency in small denominations. He took the bag to a teller's window, but, instead of depositing its contents, he converted the coins and currency into bills of large denominations. Warring then carried these large bills away from the bank, which made no record of the currency exchanges.

The currency and coins of a business would normally have been deposited in a taxpayer's bank account and drawn against by checks. The fact that Warring did not deposit them but instead converted them into bills of large denominations could certainly have been properly considered by the jury as a highly suspicious circumstance.

On July 2, 1948, Revenue Agent Ford, to whom Warring's tax returns had been referred for examination, went to Warring's home to obtain information with respect to his income for the years 1946 and 1947 and was shown the "little black books." Ford told Warring that these books were inadequate and inquired whether he had any other books or records. Warring replied that he did not.

Agent Ford then requested permission to inventory Warring's safe deposit box. Warring stated that he would have to talk to his lawyer first. After making a telephone call, he stated that he would open the box.

Agent Ford and Agent William C. Albrecht inventoried Warring's safe deposit box at the Hamilton National Bank on the same date in the presence of Warring, and found cash totaling $250,000 in currency. The currency consisted of two hundred and forty $1000 bills and one $10,000 bill. There were no papers or documents of any kind in the safe deposit box—nothing except the hoard of cash.

In the course of a conference held on July 15, 1948, and in the presence of Warring's attorney, Agent Ford asked Warring whether any part of the $250,000 found in cash in the safe deposit box pertained to his winnings during the year 1948. Warring said "Yes" and produced his black book for the year 1948, which purported to show that Warring's earnings from January 1, 1948, to and including May 28, 1948, were $110,754. This was at the rate of approximately $22,000 a month. May 28, 1948, was the last day on which Warring had entered his safe deposit box prior to its inventory on July 2, 1948, so no cash could have been deposited or taken from the box between May 28, 1948, and July 2, 1948, and the contents of the box must have remained the same during that period. Warring also told the Revenue Agent on that occasion in the presence of his counsel that in February, 1948, he had played $20 on a number with a competitor and had won as a result of that bet, $17,000.

The Government, unable to contradict these statements of Warring, accepted them in connection with its cash disbursements method and net worth method of proof and assumed that $127,754 of the total cash of $250,000 had been deposited by Warring in his safe deposit box between January 1, 1948, and May 28, 1948, as he asserted, leaving a sum of $122,246 as the amount obtained by Warring prior to the year 1948. The exclusion of $127,754 of this cash in determining Warring's true income for 1947 was, of course, most favorable to him.

In August, 1948, Agent Kennedy was assigned to the case. Kennedy had participated in the prior 1936 and 1937 investigations of Warring. He first reviewed the old file. Ford and Kennedy

then proceeded to check for other bank accounts and safe deposit boxes of Warring at ten or twelve banks in the District of Columbia and in the nearby counties of Maryland and Virginia. They located a trifling savings account at the Hamilton National Bank and the checking account opened in the fall of 1947 referred to above. They ran the land records for the District of Columbia and nearby counties of Maryland and Virginia to ascertain whether Warring had purchased or sold any real estate, mortgages or trusts. They found no other bank accounts or safe deposit boxes and no sales of real estate or mortgages between December 31, 1936, and December 31, 1946. They also attempted to ascertain from records of the District of Columbia whether Warring had received any bequests or legacies over a 20-year period, and found none. They checked the records of Internal Revenue and found no gift tax returns filed by Warring as donor or donee.

On October 21, 1948, Kennedy and Special Agent McIntyre inventoried Warring's safe deposit box at the Hamilton National Bank and found in the box at that time a cash hoard aggregating $165,000.

The sum of $5,000 attributed to Warring as living expenses for 1947 seems moderate. In September, 1947, Warring opened for the first time a checking account and deposited in it $37,000 in cash. In 1947 he made additional cash disbursements aggregating $41,647.92, or total cash disbursed $78,647.92, as compared with disbursements in prior years after 1937 of a maximum of $15,000 or $16,000. It was in the fall of 1947 that he purchased the David farm property in Fairfax County, Virginia, for $15,090.39; the Williams farm property in Fairfax County, Virginia, for $27,000, and the Belfiori property, Washington, D. C., for $12,250. Yet Warring had never made a purchase of real estate during the 9-year period from 1938 to 1947. Likewise, it was in 1947 that Warring purchased his Cadillac sedan for $3,500. It would thus seem on this evidence that Warring's expenditures in 1947 far exceeded his reported income.

 Counsel for Warring contends that the net worth statement prepared by the Government was improperly admitted in evidence since the opening figure for cash on hand was based on an extra-judicial statement made by Warring in 1936 and was not corroborated. The Supreme Court in the recent case of Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, held that such a statement, if it is made after the fact to an investigating agent and is material to the Government's case, may not be used if it is uncorroborated. See Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L. Ed. 876. We think there was sufficient corroboration in this case.

The statement was made to two agents investigating Warring's civil liability for taxes. On December 31, 1936, these two agents in the presence of Warring and his accountant opened Warring's safe deposit box and found therein $25,590.26. Warring stated that this was all the cash on hand he had at that time. The Government made this statement the basis of their opening cash figure in Warring's net-worth and cash-disbursements statement for 1947. They used this 1936 figure as total cash on hand as of that date and, then, using the cash disbursement method over the intervening years, computed Warring's cash on hand as of December 31, 1946, from that figure.

Smith v. United States, supra, is similar to the instant case in that there the taxpayer had made a net worth statement, and the Government used in its opening net worth figures, information from the taxpayer's net-worth statement plus his extra-judicial admissions. In that case, as in this case, the admissions were used to establish part of the opening net-worth figures.

The Court pointed out, 348 U.S. 158 and 159, 75 S.Ct. 200:

"But substantiating the opening net worth is just one method of corroborating these extra-judicial statements. Petitioner's admissions may also be corroborated by an entirely

different line of proof—by independent evidence concerning petitioner's conduct during the prosecution period, which tends to establish the crime of tax evasion without resort to the net worth computations.

\* \* \*

"These substantial expenditures, savings and investments might not, of themselves, *suffice to support a conviction of tax evasion* without evidence of a starting point indicating a lack of funds from which these payments might have come. But this conduct does corroborate the *net worth statement by tending* to show that the petitioner was understating his income during the prosecution years. We cannot say that there is so little relation between expenditures and income that the Government's proof of expenditures far in excess of reported income, coupled with proof of a business producing unrecorded amounts of income, fails to corroborate the charge that petitioner's earnings during the prosecution years exceeded his declared income." (Italics ours.)

This is the type of corroboration that we have here. Even though there may be little direct corroboration of the opening cash figure, other evidence tends to support the understatement of income shown by the statements *as a whole*. The record shows substantial purchases of real and personal property during 1947 that could not have been made on the income reported by Warring. This is the very type of corroboration which the Supreme Court relied upon in the Smith case, 348 U.S. at pages 158, 159, 75 S.Ct. at pages 200, 201.

■ As the Court pointed out in the Smith case, corroboration is needed only to allay suspicion of the veracity of the admission; it need not be proof of the offense beyond a reasonable doubt, but need only tend to support the admitted fact. The record here shows such corroboration.

Since we find corroboration, we need not discuss the problem of whether or not the admission was made after the fact. It appears that the admission was made during investigation of civil liability in 1936 but used in a criminal prosecution in 1947. Whether the "fact" was the existence of possible civil liability in 1936 we need not answer.

■ In the light of what has been set out, and other evidence in the voluminous record, we think the Government fairly made out a prima facie case for the jury, which resolved against Warring, by its verdict of guilty, many of the controverted issues of fact. There is ample evidence to sustain Agent Kennedy's testimony that the statements he prepared for the year 1947 reflected Warring's income "as clearly and as accurately as I could possibly ascertain it. I believe it is reasonably close." See, in this connection, United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186; Smith v. United States, 348 U.S. 147, 75 S.Ct. 194; Holland v. United States, 348 U.S. 121, 75 S. Ct. 127; United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546; Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876; Bateman v. United States, 9 Cir., 212 F.2d 61; Graves v. United States, 10 Cir., 191 F. 2d 579; Bell v. United States, 4 Cir., 185 F.2d 302; Jelaza v. United States, 4 Cir., 179 F.2d 202; United States v. Fenwick, 7 Cir., 177 F.2d 488; Bryan v. United States, 5 Cir., 175 F.2d 223.

■ There is no merit in the contention that the Government failed to prove that the money in the safe-deposit box was all owned by Emmitt Warring, as against the claim that part of the money might well have been owned by his brother, Charles Warring. True it is that the safe-deposit box was rented in the names of both Emmitt Warring and Charles Warring. The District Judge, on this item, properly instructed the jury:

"There is no affirmative evidence in the case that Charles R. Warring did enter the safe deposit box, although it is argued by counsel for the defendant that it is possible he may have at some time accompanied Emmitt Warring, when the latter

visited the box and signed slips for authorized entry.

"There is no evidence in the case that Charles R. Warring ever personally owned any property, or was engaged in any gainful pursuit. He was not called as a witness in this case either by the Government or by the defendant.

"If the jury believes from the evidence in the case, much of which has heretofore been referred to with respect to the safe deposit box and its contents, and the occasion for and the circumstances concerning it, and the conversations between the revenue agent leading to the inventory of the box on July 2, 1948, and finding therein $250,000 in cash, and the subsequent conversation between the revenue agent and the defendant in the presence of the defendant's personal counsel, the jury may possibly find that the whole constitutes a prima facie case by the Government that the defendant was in possession and control of the $250,000 in the box at the time of its inventory."

■ The same observations might be made as to the contention that Kyle and Sweeney, alleged partners of Warring in the "numbers" game, had an interest in this money. Even if Kyle and Sweeney were Warring's partners in this nefarious racket, the jury were amply warranted in concluding that all the money was owned by Warring. It is a fair assumption that if these partners could have given testimony indicating that they had any interest in the income attributed to Warring, Warring would have called them as witnesses.

■ We find no reversible error in the alleged improper conduct of the District Attorney in his closing argument to the jury. When the District Attorney once possibly went too far, his remark was quickly withdrawn upon the caution of Judge Chesnut, who carefully warned the jury:

"It is not disputed in this case that the defendant was engaged in gambling for many years prior to 1947 with the exception of the years 1939 to 1942, in which years he filed no income tax returns, and was not engaged in any business not being at liberty at that time; but you are instructed that assuming that the defendant's type of gambling was illegal, he is not indicted for that offense and in considering your verdict in this case you should not entertain any prejudice against him for that reason because the case related only to alleged evasion of federal income tax payments."

It seems, too, that defense counsel, at the time, took no exception to these remarks of the District Attorney. See, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129; Crumpton v. United States, 138 U.S. 361, 364, 11 S.Ct. 355, 34 L.Ed. 958; Robinson v. United States, 6 Cir., 144 F. 2d 392; DiCarlo v. United States, 2 Cir., 6 F.2d 364, 368.

■ Nor is there merit in the contention that the Government utterly failed to follow obvious leads which would have disclosed facts favorable to Warring. Judge Chesnut did express some concern that the Government failed to call Charles Warring as a witness. The District Attorney properly replied that this was not necessary since he was confident that a strong, prima-facie case had been made against Emmitt Warring. It seems a fair presumption that Charles Warring, a brother of Emmitt Warring, would not have been favorably disposed to the Government. If he was available, and could have helped Emmitt Warring, he could have been called as a witness by Emmitt Warring's counsel.

Counsel for Warring argued energetically to the jury many alleged errors or discrepancies in the Government's cash disbursements and net worth statements. These contentions involved, for the most part, questions of fact for the jury, and the jury resolved those factual issues against Warring by its verdict of guilty.

■ No controverted issue of fact was withdrawn from the jury and Judge

Chesnut made it crystal clear that the jury was not required to accept the testimony and calculations of the Government agents, and he carefully included in his elaborate charge the precautions suggested by the Supreme Court in the very recent cases of United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186; Smith v. United States, 348 U.S. 147, 75 S.Ct. 194; Friedberg v. United States, 348 U.S. 142, 75 S.Ct. 138; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127. See, also, United States v. Johnson, 319 U.S. 503, 517–519, 63 S.Ct. 1233, 87 L.Ed. 1546; Guzik v. United States, 7 Cir., 54 F.2d 618.

We think Warring received an eminently fair trial under the guidance of a capable, experienced and dispassionate judge. The judgment of the District Court is, accordingly, affirmed.

Affirmed.